## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

### CASE NO.:

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| Plaintiff, | : |
| v. | : |
| ALCATEL-LUCENT, S.A., | : |
| Defendant. | : |

### COMPLAINT

Plaintiff Securities and Exchange Commission alleges as follows:

### I. SUMMARY

1.     From December 2001 through June 2006, Alcatel, S.A., now called Alcatel-Lucent, S.A. ("Alcatel" or the "company"), through its subsidiaries and agents, violated the Foreign Corrupt Practices Act of 1977 ("FCPA") [15 U.S.C. § 78dd-1] by paying more than $8 million in bribes to foreign government officials.  Alcatel made these payments to influence acts and decisions by these foreign government officials to obtain or retain business, with the knowledge and approval of certain management level personnel of the relevant Alcatel subsidiaries.  Alcatel lacked sufficient internal controls to prevent or detect such improper payments, and improperly recorded the payments in its books and records.

2.     During this period, Alcatel's agents and/or subsidiaries paid bribes to foreign government officials in several countries to obtain or retain business:

- From December 2001 to October 2004, Alcatel's agents and/or subsidiaries paid at least $7 million in bribes to government officials of Costa Rica to obtain or retain three contracts to provide telephone services in Costa Rica totaling approximately $303 million.

- From December 2002 to June 2006, Alcatel's agents and/or subsidiaries paid bribes to government officials of Honduras to obtain or retain five telecommunications contracts totaling approximately $48 million.

- From October 2003 to May 2004, Alcatel's agents and/or subsidiaries paid bribes to government officials of Taiwan to obtain or retain a railway axle counting contract valued at approximately $27 million.

- From October 2004 to February 2006, Alcatel's agents and/or subsidiaries paid bribes to government officials of Malaysia to obtain or retain a telecommunications contract valued at approximately $85 million.

3.     All of these payments were undocumented or improperly recorded as consulting fees in the books of Alcatel's subsidiaries, and then consolidated into Alcatel's financial statements.  A lax corporate control environment aided Alcatel's improper conduct.  Alcatel failed to detect or investigate numerous red flags suggesting that its business consultants were likely making illicit payments and gifts to government officials in these countries at the direction of certain Alcatel employees.   The respective heads of several Alcatel subsidiaries and geographical regions, some of whom reported directly to Alcatel's executive committee, authorized extremely high commission payments under circumstances in which they failed to determine whether such payments were, in part, to be funneled to government officials in

violation of the FCPA.  These high-level employees therefore knew, or were severely reckless in not knowing, that Alcatel paid bribes to foreign government officials.

4.      By making these payments, Alcatel violated the FCPA as incorporated into the federal securities laws as Sections 30A, 13(b)(2)(A), and 13(b)(2)(B) of the Securities Exchange Act of 1934 ("Exchange Act"), and also violated Section 13(b)(5) of the Exchange Act.

5.      Unless restrained and enjoined, Alcatel is reasonably likely to continue to engage in the acts and practices set forth in this complaint and in acts and practices of similar purport and object.

## II.  JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

7.      Personal jurisdiction and venue are appropriate in this Court under Section 27 of the Exchange Act [15 U.S.C. §§ 78aa].

8.      Alcatel, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged in this complaint.

## III.  DEFENDANT

9.      **Alcatel-Lucent, S.A. ("Alcatel")**, formerly known as Alcatel, S.A., a French corporation headquartered in Paris, France, is one of the world's largest providers of telecommunications equipment and services, with more than 75,000 employees in 140 countries, including the United States.  Until November 30, 2006, Alcatel's American Depository Receipts ("ADRs") were registered with the Commission pursuant to Exchange Act Section 12(b) and

traded on the New York Stock Exchange ("NYSE").  As such, during the time the relevant conduct occurred, Alcatel was required to file reports with the Commission under Section 13 of the Exchange Act [15 U.S.C. § 78m], and was an "issuer" within the meaning of the FCPA [15 U.S.C. § 78dd-1].  Alcatel conducted its commercial transactions through its subsidiaries, including Alcatel CIT, S.A. and Alcatel SEL, AG.  On November 30, 2006, an Alcatel subsidiary merged with Lucent Technologies Inc. in the United States and Alcatel changed its name to Alcatel-Lucent, S.A.  After the merger, the company's shares were traded on the Paris Euronext exchange and as ADRs on the NYSE.

## IV.  RELATED ENTITIES

10.    **Alcatel CIT, S.A.**, now known as Alcatel-Lucent France, S.A., a wholly-owned subsidiary of Alcatel in France, sold telephone technology and networks to telecommunications providers owned by foreign governments, including the governments of Costa Rica, Honduras, and Malaysia, and paid Alcatel's business consultants in those countries.  Alcatel CIT's financial results were included in the consolidated financial statements that Alcatel filed with the Commission.  Alcatel CIT maintained a bank account at ABN Amro Bank in New York, NY, which was used, in part, to pay business consultants located around the world.

11.    **Alcatel Standard A.G.**, a wholly-owned subsidiary of Alcatel in Switzerland that in 2007 was merged into Alcatel-Lucent Trade International A.G., entered into most agreements with business consultants worldwide on behalf of Alcatel CIT and other Alcatel entities, including the agreements that are referenced in this complaint.

12.    **Alcatel de Costa Rica S.A.**, now known as Alcatel Centroamerica S.A., a wholly-owned subsidiary of Alcatel in Costa Rica, was responsible for the day-to-day commercial operations of Alcatel in Costa Rica and Honduras.  Throughout the relevant time

period, Alcatel de Costa Rica's financial results were included in the consolidated financial statements that Alcatel filed with the Commission.

13.    **Alcatel SEL, A.G.**, now known as Alcatel-Lucent Deutschland A.G., a wholly-owned subsidiary of Alcatel in Germany, participated in bidding for railway projects in Taiwan. Throughout the relevant time period, Alcatel SEL's financial results were included in the consolidated financial statements that Alcatel filed with the Commission.

14.    **Alcatel Malaysia**, a majority-owned subsidiary of Alcatel in Malaysia, was responsible for the day-to-day commercial operations of Alcatel in Malaysia.  Alcatel currently owns 51% of its shares.  Two private local entities own the remaining shares.  Alcatel Malaysia's financial results were consolidated in the financial statements Alcatel filed with the Commission.

## V. FACTS

15.    Alcatel, the parent issuer, was run by an executive committee made up of very senior officers, including the CEO and CFO, and a handful of support staff.  Alcatel itself did not conduct actual business with any customer.  Starting in the 1990s, Alcatel utilized a consistent strategy to obtain contracts in many parts of the world, under which Alcatel typically used a subsidiary in the country to obtain contracts.  The subsidiary's "country senior officer" managed the subsidiary and selected business consultants purportedly to provide sales, marketing, and technical support and, in some cases, to lobby government officials to obtain public contracts in that country.

16.    Alcatel used Alcatel Standard to conduct very limited due diligence on the business consultants.  The country senior officer then prepared a cursory description of the services the business consultants would perform and the compensation they would receive. Based on the limited information provided to them, the heads of Alcatel Standard, of the

subsidiary with the customer contract (Alcatel CIT for most of the agreements that are referenced in this complaint), and of various geographical regions all approved the retention of the consultants.

17.     After having obtained all necessary approvals for the retention of the business consultant, Alcatel Standard entered into an agreement with the consultant, usually requiring the consultant to perform vaguely-described marketing services.  The subsidiary with the customer contract (Alcatel CIT for most of the agreements that are referenced in this complaint) typically paid the consultants, usually after it had successfully obtained and executed contracts with the government to sell telecommunications services and equipment.  In every bribery scheme described in this complaint, the respective heads of the relevant subsidiaries and geographic regions either were aware of, or ignored, significant red flags that indicated that the respective country senior officers and other Alcatel employees were using business consultants to pay bribes to foreign government officials.

18.     Alcatel's internal controls over payments to its business consultants in foreign countries were weak at best.  Although at some point Alcatel utilized more than 235 business consultants in more than 70 countries, the employees responsible for reviewing due diligence reports on the company's business consultants sometimes did not speak the language in which these reports were written, and had little or no understanding of these consultants' background or the tasks they purportedly performed.

19.     While Alcatel had a company-wide FCPA training program, Alcatel's employees routinely disregarded or circumvented it.  For example, a former high-level employee and the president of Alcatel Standard trained country senior officers, including those who conducted business in Latin America and Taiwan, on how to "paper" consulting agreements so that Alcatel

Standard would authorize them.  The controls Alcatel had in place were insufficient to prevent bribery because Alcatel employees either disregarded or circumvented them by providing incomplete and inaccurate information to those involved in the review process.  Finally, although Alcatel had a risk assessment committee, it typically focused on issues that were likely to result in customer lawsuits and not on bribery or excessive commissions to business consultants.

A.    **The Costa Rica Bribery Scheme**

20.    From December 2001 to October 2004, Alcatel bribed government officials in Costa Rica to obtain telecommunications contracts valued at approximately $303 million.

21.    The Instituto Costarricense de Electricidad (the "ICE") is the Costa Rican government-owned company that provides telecommunications services, evaluates bids, and awards telecommunications contracts in Costa Rica.  The ICE was governed by a seven-member board of directors that evaluated and approved, on behalf of the government of Costa Rica, all bid proposals submitted by telecommunications companies.  The Board of Directors was led by an Executive President, who was appointed by the President of Costa Rica.  The other members of the Board of Directors were appointed by the President of Costa Rica and the Costa Rican governing cabinet.

22.    Prior to 2001, Alcatel CIT was not able to secure mobile telecommunications contracts from the ICE.  Among other things, the ICE was using a different technology from the GSM technology Alcatel CIT was offering.  In late 2000, Edgar Valverde, at the time the President and Country Senior Officer of Alcatel de Costa Rica, and Christian Sapsizian, Alcatel CIT's Director for Latin America from February 1996 until October 2004, enlisted two Costa Rican consulting companies with many contacts at the ICE ("Costa Rican Consultant A" and "Costa Rican Consultant B") to assist Alcatel in obtaining mobile telecommunications contracts.

Valverde and Sapsizian hired the consultants in part to bribe officials in the government of Costa Rica in exchange for telecommunications contracts.

23.     Valverde's brother-in-law owned and controlled Costa Rican Consultant A. However, Valverde intentionally omitted this fact from the company profile he prepared and submitted to Alcatel Standard.   Alcatel Standard failed to conduct adequate due diligence on Costa Rican Consultant A and, therefore, never identified its registered shareholders and ultimate beneficial owner.

24.     In November 2000, prior to a formal vote by the ICE Board of Directors, Sapsizian and Valverde offered a bribe to an ICE director ("ICE Director A") to be paid through Costa Rican Consultant A.  Specifically, they offered him 1.5% to 2% of the value of a contract to develop a GSM mobile network in Costa Rica and provide 400,000 lines of mobile telephone service (the "400K GSM Contract").  The bribe was in exchange for his assistance in opening a bid round for a GSM-based mobile network and to assist Alcatel CIT in obtaining contracts from the ICE.  With ICE Director A's hired influence, the ICE Board formally voted to open a bid round for developing a mobile network in Costa Rica using the GSM technology.

25.     On June 12, 2001, in part because of ICE Director A's assistance, the ICE awarded Alcatel CIT a contract, valued at approximately $44 million, to supply equipment for the ICE fixed network.  On August 28, 2001, in part because of ICE Director A's assistance, the ICE awarded Alcatel CIT a second contract, the 400K GSM Contract, which gave Alcatel CIT 100% of all new mobile lines installed in Costa Rica and 50% of all existing mobile lines.  The contract was valued at approximately $149.5 million.  In May 2002, in part because of ICE Director A's assistance, the ICE awarded Alcatel CIT a third contract, for the expansion of the fixed telephone lines central stations, valued at approximately $109.4 million.

26.   From March 2001 to March 2003, Alcatel Standard, on behalf of Alcatel CIT, executed at least five consulting agreements with Costa Rican Consultant A, in which Alcatel CIT promised to pay up to 9.75% of the value of any contract it assisted Alcatel CIT in obtaining with the ICE – a much higher commission rate than normally awarded to such a consultant. In return, the consulting agreements required Costa Rican Consultant A to perform vaguely-described marketing and advisory services. Costa Rican Consultant A created invoices purportedly for commissions related to the contracts awarded to Alcatel CIT. It then submitted those invoices, through Valverde, to Alcatel CIT.

27.   Starting in December 2001, after the ICE awarded Alcatel its first two contracts, and continuing until October 2003, Alcatel CIT transferred from its account at ABN Amro Bank in New York approximately $14.5 million to an account at the International Bank of Miami in Miami, Florida, to be further credited to Costa Rican Consultant A's account at Cuscatlan International Bank in Costa Rica. This $14.5 million fee bore no relation to actual services Costa Rican Consultant A provided. In reality, it was to be used largely to pay bribes to government officials. Costa Rican Consultant A used at least $7 million of that money to pay officials of the government of Costa Rica for assisting Alcatel CIT in obtaining and retaining business in Costa Rica, including:

| Position | Approximate Amount of Bribe |
|---|---|
| ICE Director A | $2.56 million in addition to certificates of deposit totaling $100,000 |
| High-ranking executive branch official | $950,000 received through ICE Director A |
| ICE CEO | $945,000 |
| ICE Administrator | $145,000 |
| ICE Administrator | $110,000 |

| | |
|---|---|
| Presidential Candidate | $100,000 |
| ICE Director B | $1.3 million |
| Party leader in Congress for the Social Christian Unity Party | $550,000 |

28.     Similarly, from March 2001 to December 2002, Alcatel Standard, on behalf of Alcatel CIT, executed at least four consulting agreements with Costa Rican Consultant B to assist Alcatel in obtaining telecommunications contracts in Costa Rica.  The agreements required Costa Rican Consultant B to perform vaguely-described advisory services.  Costa Rican Consultant B then created phony invoices, purportedly for commissions related to the contracts awarded to Alcatel, and submitted those invoices to Alcatel CIT.  As with Costa Rican Consultant A, Alcatel authorized Costa Rican Consultant B to receive a much higher commission rate on certain projects than normally awarded to such a consultant.

29.     Alcatel CIT transferred from its account at ABN Amro Bank in New York approximately $3.9 million to Costa Rican Consultant B.  This fee also bore no relation to actual services Costa Rican Consultant B provided and was also to be used to pay bribes to government officials.  Costa Rican Consultant B paid officials of the government of Costa Rica, including at least $930,000 to ICE director C from December 2002 until June 2004.

30.     The President of Area 1, which encompassed Latin America, worked in Alcatel's Miami office between 2000 and 2003 (and directly reported to a member of Alcatel's executive committee).  This individual approved the payments to the Costa Rican consultants, despite their high amounts.  On several occasions, this individual stated that he could go to jail if authorities in France or the United States uncovered where these payments were actually going.

31.     The president of Alcatel Standard, who also held the title of Director of International Affairs and reported to Alcatel's controller, also approved the retention of and payment to these consultants despite numerous red flags that should have alerted him that these payments were unlawful, such as the large size of the commissions and the fact that Alcatel CIT already had two other consultants in such a small country as Costa Rica.

32.     Some of the key Alcatel employees who were responsible for reviewing progress reports on the company's consultants in Costa Rica did not speak Spanish and, therefore, could not understand the reports that contained information about the work these consultants purportedly performed.  As a result, they relied on Sapsizian to translate documents and assure them that the consultants in question were doing the work they were engaged to do.

33.     Sapsizian also approved the payment of approximately $25,000 in expenses incurred by ICE officials during a trip to Paris in October 2003 while Alcatel CIT was attempting to obtain an extension of a fixed network contract in Costa Rica.  He instructed an Alcatel CIT employee to pay for some of these expenses in cash to conceal the payments and avoid leaving a paper trail leading to Alcatel.  All of these payments were intended to reward these government officials for providing Alcatel CIT with lucrative contracts.

34.     All of these officials were "foreign officials" within the meaning of the FCPA and were in a significant position to influence the policy decisions the ICE made.

**B.      The Honduras Bribery Scheme**

35.     From December 2002 to June 2006, Alcatel bribed government officials in Honduras to obtain or retain at least five telecommunications contracts valued at approximately $48 million.

36.     In February 2002, in Key Biscayne, Florida, Sapsizian and another Alcatel CIT employee met with the brother of a high-ranking executive branch official in the government of Honduras to discuss how the brothers and Alcatel could assist each other.  Sapsizian participated in this meeting to make sure the brothers understood that Alcatel's upper management in France supported any promise made to them.  The executive branch official's brother requested that Alcatel retain a specific consulting company in Honduras ("Honduran Consultant").

37.     Later in 2002, Alcatel CIT informally retained the Honduran Consultant and promised to pay it commissions of 3% to 5% of the value of certain contracts Alcatel CIT secured in Honduras.  The Honduran Consultant represented perfume and cosmetics companies in Honduras and operated as an exclusive distributor of brand name fragrances.  The Honduran Consultant had no contacts in, or prior experience with, the telecommunications industry in Honduras.   The executive branch official's brother controlled the Honduran Consultant and Alcatel CIT's sole purpose for retaining this consultant was to gain access to the high-ranking executive branch official and influence the decisions of the Empresa Hondureña de Telecomunicaciones ("Hondutel"), the Honduran government-owned telecommunications provider responsible for awarding and administering public tenders for telecommunications contracts in Honduras.

38.     As a result of Alcatel's agreement to retain and pay the Honduran Consultant, there was significant pressure on Hondutel, and on the senior government officials sitting on its Board of Directors, to keep Alcatel CIT and another Alcatel subsidiary as the contractors on five contracts which were awarded from 2002 through 2003, worth a total of about $48 million, in spite of significant failures in performance that could have resulted in termination under the terms of the agreement.  These contracts included a $2.36 million contract signed on November

12, 2002; a $17.92 million contract signed on May 12, 2003; a $7.91 million contract signed on October 27, 2003; a $2.49 million contract signed on December 6, 2003, and a $17.39 million contract signed on December 12, 2003.  At least one of these contracts was never presented to the public and was awarded directly to Alcatel.

39.      Alcatel Standard did not memorialize its agreement with the Honduran Consultant until October 2003, after Hondutel had already awarded two contracts to Alcatel CIT, at which time it formally retained the Honduran Consultant to perform vaguely-described marketing and advisory services.   At that time, Alcatel Standard memorialized its agreement to pay the Honduran Consultant commissions of 3% to 5% of the value of certain contracts Alcatel CIT and another Alcatel subsidiary secured in Honduras.

40.      Alcatel Standard knew, or was reckless in not knowing, that the Honduran Consultant was a conduit to pay bribes.   Alcatel Standard failed to conduct adequate due diligence about the Honduran Consultant and did not uncover its relationship with the high-ranking executive branch official, despite a number of red flags.  First, the Honduran Consultant was a perfume distributor with no experience in telecommunications.   Second, the executive branch official's brother regularly communicated with Alcatel employees via an e-mail address from a domain name affiliated with the executive branch official and his family.  Third, at some point in late 2003, the executive branch official and his brother directly contacted the President of Area 1 in an effort to collect sales commissions Alcatel purportedly owed to the Honduran Consultant.  Finally, the President of Area 1 was aware of the relationship between the Honduran Consultant and the executive branch official's brother, and personally met with the executive branch official to discuss Alcatel's expansion in Honduras.

41.     Following efforts by the high-ranking executive branch official and his brother to pressure Alcatel to pay the Honduran Consultant, Alcatel paid $704,388 to the Honduran Consultant between September 2004 and June 2006.  The President of Area 1 allowed these payments despite knowing that the Honduran Consultant was a perfume distributor controlled by the brother of the executive branch official.  Although the press widely covered the bribery scheme in Costa Rica beginning in October 2004, and Alcatel's executive committee knew at that time that Sapsizian and Valverde paid bribes at the highest level of the Costa Rican government using sham consultants, Alcatel took no steps to terminate the Honduran Consultant and Alcatel CIT continued to make these illicit payments until June 2006.  Although it is unknown whether the Honduran Consultant shared this money with the executive branch official, Sapsizian had every expectation that money Alcatel paid to the Honduran Consultant would flow to the executive branch official.

42.     Alcatel CIT also paid for Hondutel's general manager and his wife to travel to Europe in June 2003 and for his daughter to travel to Europe in 2004, without any legitimate business purposes.  Alcatel CIT also paid for the president of Conatel, the Honduran government agency that regulated the telecommunications sector in Honduras, who had close ties to the executive branch official, to travel to various conferences, including in Paris, France in July 2003 and in Cannes, France in December 2004.  Finally, Alcatel CIT paid for a Hondutel attorney and her daughter to travel to Paris in June 2003, a trip which consisted almost entirely of leisure activities and featured a private driver.  In March 2004, Alcatel CIT also paid $1,500 to this Hondutel attorney.

43.     All of these officials were "foreign officials" within the meaning of the FCPA and were in a significant position to influence the policy decisions Hondutel made.

### C.     The Taiwan Bribery Scheme

44.     From October 2003 to May 2004, Alcatel bribed government officials in Taiwan to obtain a railway axle counting contract valued at approximately $27 million.

45.     A senior Alcatel employee, at the time Director of International Business and Sales at Alcatel SEL AG, an Alcatel subsidiary, ("Alcatel SEL employee") hired two consultants in Taiwan ("Taiwanese Consultant A" and "Taiwanese Consultant B") in 2000 and 2002, respectively.  Both consultants possessed close ties to legislators in the Taiwanese government.

46.     The Alcatel SEL employee hired Taiwanese Consultant A in 2000 to pressure the Taiwan Railway Administration (the "TRA") to act in Alcatel's favor in the bid process.  The TRA, a Taiwanese government-owned authority, was responsible for awarding and administering public tenders for contracts to manufacture and install axle counting systems to facilitate rail traffic in Taiwan.  The TRA was an agency of Taiwan's Ministry of Transportation and Communications, a cabinet-level governmental body responsible for the regulation of transportation and communications networks and operations.

47.     As with most consultants hired by Alcatel, Taiwanese Consultant A entered into a consulting agreement with Alcatel Standard.  In the course of its due diligence, Alcatel Standard repeatedly requested more information concerning Taiwanese Consultant A from Alcatel SEL.  Although Alcatel SEL only provided limited information about Taiwanese Consultant A, Alcatel Standard circumvented its own procedures and approved the consulting agreement.  Additionally, the Alcatel SEL employee subsequently amended this agreement to increase Taiwanese Consultant A's compensation, without following Alcatel's procedure for the amendment of consulting agreements.

48.     In May 2004, Alcatel SEL paid a commission of approximately $920,000 to Taiwanese Consultant A through its account at ABN Amro Bank in New York.  At various times, Taiwanese Consultant A paid bribes to two Taiwanese legislators, Legislator A and Legislator B.

49.     Legislator A assisted Alcatel in convincing the TRA that Alcatel SEL's system satisfied the technical requirements of the tenders.  He also publicly supported Alcatel SEL's bid and provided advice to Alcatel SEL concerning its TRA documents.  Legislator B, in turn, was requested to alter the TRA's technical specifications to improve Alcatel SEL's bidding chances. Although it is unclear how much of Alcatel SEL's $920,000 eventually flowed to foreign government officials, the owner of Taiwanese Consultant A promised $180,000 in campaign funds for Legislator B's 2004 election and paid him at least $90,000 in 2004, after Alcatel SEL's affiliate won the bid.

50.     The Alcatel SEL employee and Taiwanese Consultant A also spent approximately $10,000 to arrange trips to Germany in October 2003 for the secretary to the Taiwan Transportation and Communications Minister, and in 2002 for an assistant in the office of Legislator A.  Both trips were for personal, entertainment purposes, and the secretary to the Taiwan Transportation and Communications Minister invited his ex-wife at Alcatel's expense. Alcatel SEL paid for the hotel directly and reimbursed the Alcatel SEL employee for travel expenses, including train tickets, taxis, lavish meals, and small gifts.  Alcatel SEL's management in Germany knew of and approved reimbursement of many of these expenses.

51.     Without Alcatel Standard's approval, the Alcatel SEL employee hired Taiwanese Consultant B in 2002, because its owner was the brother of another Taiwanese legislator, Legislator C.  To bribe Legislator C, the Alcatel SEL employee and others created a phony

consulting agreement between an Alcatel affiliate and Taiwanese Consultant B, even though Taiwanese Consultant B was never expected to provide any services to Alcatel or its affiliate. An Alcatel affiliate paid approximately $36,000 to Taiwanese Consultant B in 2004.

52.     Legislators A, B, and C were "foreign officials" within the meaning of the FCPA and were in a significant position to influence the policy decisions the TRA made.

53.     The fees Alcatel SEL and Alcatel's affiliate paid to Taiwanese Consultant A and Taiwanese Consultant B, respectively, bore no relation to actual services these entities provided to Alcatel.

54.     On December 30, 2003, the TRA accepted an Alcatel affiliate's price bid and granted the affiliate a supply contract worth approximately $27 million.

**D.     The Malaysia Bribery Scheme**

55.     From October 2004 to February 2006, Alcatel bribed government officials in Malaysia to obtain confidential information relating to a public tender that Alcatel ultimately won, the result of which yielded a telecommunications contract valued at approximately $85 million.

56.     Telekom Malaysia is the Malaysian government-owned telecommunications company that provides telecommunications services, evaluates bids, and awards telecommunications contracts in Malaysia.   The Malaysian Ministry of Finance owned approximately 43% of Telekom Malaysia's shares, had veto power over all its major expenditures, and made its key operational decisions.   The government owned its interest in Telekom Malaysia through the Minister of Finance, who had the status of a "special shareholder."   Most senior Telekom Malaysia officers were political appointees, including the

Chairman and Director, the Chairman of the Board of the Tender Committee, and the Executive Director.

57.     Between October 2004 and February 2006, Alcatel Malaysia personnel paid bribes to employees of Telekom Malaysia in exchange for non-public information.  This non-public information included important documents and budget information relating to ongoing bids and competitor pricing information.   Alcatel Malaysia's management consented to these payments.

58.     These bribes assisted Alcatel Malaysia in obtaining a contract with a potential value of $85 million.

59.     The Telekom Malaysia employees who received bribes were "foreign officials" within the meaning of the FCPA and were in a significant position to influence the policy decisions Telekom Malaysia made.

60.     Alcatel Standard also made significant lump-sum payments through U.S. bank accounts to two consultants ("Malaysian Consultant A" and "Malaysian Consultant B"), purportedly for market research.

61.     Alcatel Standard paid $200,000 to Malaysian Consultant A in 2005 for a series of "market reports" describing conditions in the Malaysian telecommunications market.  Similarly, Alcatel Standard paid $500,000 to Malaysian Consultant B in 2005 for a "strategic intelligence report."

62.     However, the work product these consultants prepared could not justify the size of Alcatel Standard's payments.  In fact, Malaysian Consultant A and Malaysian Consultant B did not appear to render any legitimate services to Alcatel Malaysia in connection with these payments.

63.     These consultants also worked for Alcatel Malaysia before formal agreements were finalized and executed, under what they called "gentlemen's agreements," which required that consulting agreements be entered into retroactively.  This process allowed consultants to work for Alcatel Malaysia without being properly vetted through Alcatel Standard's due diligence process.

**E.      Alcatel Employed U.S. Means to Engage in Bribery**

64.     Alcatel made bribe payments directly or indirectly to foreign government officials in connection with numerous projects involving business in Costa Rica, Honduras, Taiwan, and Malaysia, including using the mails and other means and instrumentalities of United States interstate commerce.   The use of interstate commerce in connection with bribery included making illegal payments through United States banks; conducting meetings in the United States in furtherance of a bribery scheme; signing or approving sham consulting agreements in the United States to conceal the bribery scheme; and transmitting mail, electronic mail, and facsimile messages in and out of the United States.

**F.      Alcatel Failed to Maintain Its Books and Records**

65.     Alcatel made numerous payments to third parties in ways that obscured the purpose for, and the ultimate recipients of, the payments.  In particular, Alcatel CIT and Alcatel SEL together paid more than $8 million in bribes to foreign government officials.  Doing so involved the falsification of Alcatel's books and records by employees throughout the company (including at Alcatel CIT, Alcatel Standard, Alcatel SEL, and Alcatel Malaysia).  Specifically, Alcatel failed to keep accurate books and records by (1) entering into consulting agreements retroactively; (2) establishing and using a system of intermediaries to obscure the source and destination of funds; (3) making payments pursuant to business consulting agreements that

inaccurately described the services provided; (4) generating false invoices and other false documents to justify payments; (5) disbursing funds in cash with inaccurate documentation authorizing or supporting the withdrawals; (6) recording illicit payments as legitimate consulting fees; and (7) recording bribes as payment for legitimate services.

**G.     Alcatel Failed to Maintain Adequate Internal Controls**

66.     Alcatel failed to implement adequate internal controls to comply with the company's NYSE listing, including the detection and prevention of violations of the FCPA. First, Alcatel and/or its subsidiaries falsified books and records, entered into agreements retroactively, and obscured the purpose for, and ultimate recipient of, illicit payments. Alcatel used business consultants and intermediaries to funnel bribes in at least four countries. Alcatel created and used false invoices and payment documentation under business consulting agreements that described services that were never intended to be rendered. Illicit payments were falsely recorded as expenses for consulting fees.

67.     Second, Alcatel also routinely circumvented the internal controls the company had in place. Although the company in theory had a policy of "checks and balances" to authorize the retention of business consultants, which required several signatures to approve the retention of, and payment to, business consultants, Alcatel employees often violated that policy. In numerous instances, Alcatel officials responsible for reviewing due diligence reports on consultants failed to conduct any review of the documents or could not read the language in which the documents were written. Alcatel employees also entered into agreements retroactively and obscured the amounts paid to business consultants by splitting the payments among separate agreements (to conceal the high commissions Alcatel paid). Finally, Alcatel Standard's due diligence on business consultants was inadequate, and Alcatel CIT often paid business

consultants without adequate proof of services rendered.  Alcatel CIT failed to establish robust controls over cash disbursements, allowed manual payments without documentation, and Alcatel's FCPA compliance function was understaffed and lacked independence.  Alcatel also failed to conduct thorough anti-bribery and corruption training.

## CLAIMS FOR RELIEF

### FIRST COUNT

#### Violations of Section 30A of the Exchange Act

68.  The Commission realleges and incorporates by reference Paragraphs 1 through 67.

69.  As described above, Alcatel, through its officers, agents, subsidiaries, and affiliates, corruptly offered, promised to pay, or authorized illicit payments to a person, while knowing that all or a portion of those payments would be offered, given, or promised, directly or indirectly, to foreign officials for the purposes of influencing their acts or decisions in their official capacity, inducing them to do or omit to do actions in violation of their lawful duties, securing an improper advantage, or inducing such foreign officials to use their influence with a foreign government or instrumentality thereof to assist Alcatel in obtaining or retaining business.

70.  By reason of the foregoing, Alcatel violated the anti-bribery provisions of the FCPA, as codified at Section 30A of the Exchange Act [15 U.S.C. §78dd-1].

### SECOND COUNT

#### Violations of Section 13(b)(2)(A) of the Exchange Act

71.  The Commission realleges and incorporates by reference Paragraphs 1 through 67.

72.     As described above, Alcatel, through its officers, agents, subsidiaries, and affiliates, failed to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflected its transactions and dispositions of its assets.

73.     By reason of the foregoing, Alcatel violated the books-and-records provisions of the FCPA, as codified at Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. §78m(b)(2)(A)].

## THIRD COUNT

### Violations of Section 13(b)(2)(B) of the Exchange Act

74.     The Commission realleges and incorporates by reference Paragraphs 1 through 67.

75.     As described above, with respect to improper payments to foreign officials, Alcatel, through its officers, agents, subsidiaries, and affiliates, failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that: (i) payments were made in accordance with management's general or specific authorization; and (ii) payments were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for its assets.

76.     By reason of the foregoing, Alcatel violated the internal accounting controls provisions of the FCPA, as codified at Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. §78m(b)(2)(B)].

## FOURTH COUNT

### Violations of Section 13(b)(5) of the Exchange Act

77.     The Commission realleges and incorporates by reference Paragraphs 1 through 67.

78.     By engaging in the conduct described above, Alcatel, through its officers, agents, subsidiaries, and affiliates, knowingly failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurance that transactions were recorded in its books and records in accordance with Section 13(b)(2)(A) of the Exchange Act.

79.     Alcatel also falsified, or caused to be falsified, its books and records.

80.     By reason of the foregoing, Alcatel violated Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)].

### VII.  PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a judgment:

A.      Permanently enjoining Alcatel from violating Sections 30A, 13(b)(2)(A), 13(b)(2)(B), and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78dd-1, 78m(b)(2)(A) and (B), and 78m(b)(5)]; and

B.      Ordering Alcatel to disgorge ill-gotten gains, with prejudgment interest, wrongfully obtained as a result of its illegal conduct.

C.      Granting such further relief as the Court may deem just and appropriate.

Dated:  December 7, 2010

Respectfully submitted,

Robert K. Levenson
Florida Bar No. 0089771
Regional Trial Counsel
U.S. Securities and Exchange Commission
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
(305) 982-6341 (direct dial)
(305) 536-4154 (facsimile)
levensonr@sec.gov

Thierry Olivier Desmet
Florida Bar No. 0143863
Assistant Regional Director, FCPA Unit
U.S. Securities and Exchange Commission
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
(305) 982-6374 (direct dial)

Ernesto Palacios
Florida Bar No. 0529168
Senior Counsel, FCPA Unit
U.S. Securities and Exchange Commission
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
(305) 982-6306 (direct dial)